
# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REZA JAFARI,<br><br>            Plaintiff,<br><br>   vs.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for La Jolla Bank; et al.,<br><br>            Defendants. | CASE NO. 12cv1971-LAB (RBB)<br><br>**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** |

**General Background**

In September 2011, Plaintiff Reza Jafari bought a single family home in Rancho Santa Fe, California from Birger Greg Bacino. To be precise, the home was originally owned by ALB Properties, LLC, whose managing partner was Bacino, and it had conveyed the home to a trust created by him. ALB and Bacino, however, had been in Chapter 7 bankruptcy since December 31, 2009, and the home was encumbered by liens. One of them was a $2,540,000 construction loan from La Jolla Bank, which was personally guaranteed by Bacino. This lien was held by the FDIC, which was appointed receiver of La Jolla Bank after it was closed by the Office of Thrift Supervision on February 19, 2010.

The other liens were: (1) delinquent property taxes for $68,198.51; (2) a Chevy Chase Bank loan with an amount due of more than $7.7 million; (3) twelve mechanics' liens totaling

1  $433,343; and (4) a homeowners' association lien of $12,208. According to Jafari, these
2  liens were all senior to the La Jolla Bank lien, and the Chevy Chase lien was most senior.
3  In fact, on July 27, 2011 the judge presiding over ALB and Bacino's bankruptcy granted
4  Chevy Chase relief from the automatic stay and it was poised to foreclose. If it had followed
5  through, the other lienholders would have received nothing because the fair market value
6  of the home was less than the $7.7 million Chevy Chase was owed.

7  With the outstanding liens exceeding the value of the home, Jafari and Bacino
8  entered into a short sale agreement for $4,475,000, which the existing lienholders allegedly
9  blessed. Jafari would put up the money---$3,132,500 with a loan from Union Bank and the
10 remainder by himself---and he would receive title to the home free and clear of all existing
11 liens. The FDIC, in particular, agreed to accept $135,000 in a release agreement, although
12 this was contingent on ALB and Bacino satisfying certain non-monetary conditions. Jafari
13 alleges that he didn't see this release agreement before he opened escrow to purchase the
14 home.

15 Escrow closed on September 23, 2011, leaving Jafari confident that all preexisting
16 liens would be released and that the home would be encumbered only by his Union Bank
17 loan. On September 26, 2011, escrow wired or mailed checks to all lienholders. This
18 included a wire transfer of $135,000 to the FDIC, with the request that it reconvey the La
19 Jolla Bank deed of trust to Jafari. The next day, the FDIC returned the $135,000 to escrow
20 and refused to reconvey the deed, however, claiming that ALB and Bacino had failed to
21 satisfy the non-monetary conditions of the release agreement. This is what the FDIC's
22 lawyer said, in a letter to the escrow company:

> The FDIC-R received a wire in the amount of $135,000 yesterday. Please see the enclosed wire transmittal information received by the FDIC-R.
>
> Based upon my review of the document accompanying the wire, it appears that the wire may have been originated in connection with a potential sale of the property located at 14747 Roxbury Terrace. Correspondence received by the FDIC-R indicates that The Heritage Escrow Company may be acting as an escrow agent in connection with the sale of the Property.

> The FDIC-R has previously been approached by a guarantor of the loan encumbering the Property with a request to release the deed of trust which encumbers the Property. Certain specific conditions were clearly established as a prerequisite to considering the release that deed of trust.
>
> Please be advised that the conditions which were established by the FDIC-R related to the release of the deed of trust have not yet occurred. Accordingly, the FDIC-R will not be releasing the security interest which encumbers the Property.
>
> Please be further advised that the FDIC-R will be returning the wire to the sender and seeking authorization within the FDIC-R to enforce all of the rights and remedies which the FDIC-R has under the deed of trust encumbering the Property.

(Doc. No. 3-18.) Jafari alleges that he didn't learn about this until months later.

On January 10, 2012, the FDIC's attorney contacted Jafari, confirming that the La Jolla Bank loan hadn't been repaid, that the deed of trust hadn't been reconveyed, and that as a secured creditor the FDIC would foreclose on the home. It subsequently served a payoff demand stating the amount due was $3,428,937.44 and on April 2, 2012, the FDIC recorded a notice of default. Jafari and Union Bank filed a proof of claim with the FDIC on May 21, 2012, and it has until November 17, 2012 to respond. However, through the present the FDIC has refused to address the proof of claim (or a July 6, 2012 letter from Jafari's counsel setting forth his legal and equitable claims) and on August 1, 2012 it filed a notice of sale for August 28, 2012. It's that sale that Jafari wants the Court to put on hold.

**The Release Agreement**

At the heart of the parties' dispute is the release agreement executed by Bacino and the FDIC on September 8, 2011. According to Jafari, it is a valid contract and Bacino "has performed those provisions that are material, lawful, and enforceable." (Compl. at 28.) Any provisions he hasn't performed, on the other hand, "are unlawful . . . and do not excuse the FDIC's obligation to perform." That brings the dispute into even sharper focus. The issue isn't whether Bacino satisfied all conditions of the release agreement, but whether those he didn't satisfy, and that are the basis for the FDIC's rejection of the $135,000, were legitimate conditions in the first instance. Those conditions appear chiefly in one paragraph of the release agreement.

> The FDIC-R is willing to consent to the release of collateral as outlined in this Letter so long as the Guarantor(s) acknowledge and agree that by consenting to the release of collateral, the FDIC-R is not forbearing in any way with respect to its remedies under the Loan Documents, and is not waiving or releasing any of its claims with respect to the Borrower or the Guarantor(s) under the Loan Documents. Borrower and Guarantor(s) are willing to sign this Letter to assure the FDIC-R that they acknowledge and agree that the FDIC-R is not forbearing in any way with respect to its remedies under the Loan Documents, and not waiving or releasing any of its claims with respect to the Borrower or the Guarantor(s) under the Loan Documents. Prior to effectuating the release of collateral referenced herein, Mr. Bacino acknowledges that he will be required to provide an opinion from his bankruptcy counsel, in a form satisfactory to the FDIC-R in its sole and absolute discretion, that the release of collateral contemplated by this letter and the continuing obligation of Mr. Bacino under his Guarantee do not require approval of the Bankruptcy Court and that the guarantee executed by Mr. Bacino will continue to be effective against him in the current bankruptcy court litigation and in any subsequent litigation derived therefrom. ALB shall also provide an opinion from bankruptcy counsel, in a form satisfactory to the FDIC-R in its sole and absolute discretion, that the release of collateral contemplated by this letter and the continuing obligation of ALB under the Loan Documents do not require approval of the Bankruptcy Court and that the Loan Documents executed by ALB will continue to be effective against ALB in subsequent litigation.

(Doc. No. 3-40.)

**Jurisdiction**

The first question the Court confronts here is whether it even has jurisdiction over Jafari's claims against the FDIC. Why wouldn't it? Because pursuant to 12 U.S.C. § 1821(d)(13)(D) claims against the FDIC must be exhausted by the FDIC's own administrative process before they can be brought in court—and this exhaustion requirement is jurisdictional. It covers two kinds of claims:

> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver

/ / /

The Ninth Circuit addressed the exhaustion requirement in *Henderson v. Bank of New England*, which both Jafari and the FDIC cite in their briefs:

> Congress created a claims process for the filing, consideration and determination of claims against insolvent banks. 12 U.S.C. § 1821(d)(3)-(10). The receivership claims process "allow[s] the FDIC to quickly resolve many of the claims against failed financial institutions without unduly burdening the District Courts."  H.R.Rep. No. 101-54(I), 101st Cong., 1st Sess., reprinted in 1989 U.S.C.C.A.N. 87, 215.
>
> Once a claim is filed, the FDIC has 180 days to determine whether to allow or disallow the claim.  12 U.S.C. § 1821(d)(5)(A)(i).  If the claim is disallowed, or if the 180 days expire without a determination by the FDIC, then the claimant may request further administrative consideration of the claim, or seek judicial review.  12 U.S.C. § 1821(d)(6).
>
> The statute contains no provision granting federal jurisdiction to claims filed after a receiver is appointed but before administrative exhaustion. *Meliezer v. RTC*, 952 F.2d 879, 882 (5th Cir. 1992).  Section 1821(d)(13)(D) strips all courts of jurisdiction over claims made outside the administrative procedures of section 1821 . . . .
>
> A claimant must therefore first complete the claims process before seeking judicial review. *Abbott Bldg. Corp. v. United States*, 951 F.2d 191, 194 n.3 (9th Cir. 1991) ("FIRREA did create a claims procedure, and required its exhaustion . . . .)

986 F.2d 319, 320–21 (9th Cir. 1993).  Jafari concedes that he has merely *filed*, rather than actually *exhausted*, his administrative claim.  Indeed, it is still pending before the FDIC. (Compl. at 25.) He argues, nonetheless, that "the district court is not without jurisdiction over the action when a claimant has filed an administrative Proof of Claim and it remains pending." (Doc. No. 3-4 at 10.)  The problem with this argument is that Jafari relies on cases in which the litigation at issue *preceded* the FDIC's appointment as receiver of the defendant lending institution and was pending at the time of the appointment:

> We recognize that some courts, addressing the issue of jurisdiction over *actions pending at the time of the FDIC's appointment as receiver*, have stayed, not dismissed, the actions.  We agree that a stay may be appropriate where the district court examines jurisdiction when the claimant still has time to file an administrative claim with the FDIC before the administrative bar date passes.  Dismissal may not be appropriate in such a case because the claimant still can comply with FIRREA's exhaustion requirement.  The district court technically does not lose jurisdiction over the case until the claimant fails to file a timely administrative claim.  *See, e.g.,*

> *Marquis v. FDIC*, 965 F.2d 1148, 1154–55 (1st Cir. 1992) (observing that FIRREA's purpose, the efficient processing of claims against failed banks, "would be disserved by forcing the courts to dismiss all pending litigation, only to have the cases refiled when and if administrative settlement proved impracticable"); *Carney*, 19 F.3d at 95 (reversing district court's dismissal for lack of subject matter jurisdiction and approving of *Marquis*' language that a court should stay an action to permit exhaustion).

*Intercontinental Travel Marketing v. FDIC*, 45 F.3d 1278, 1284 (9th Cir. 1994) (emphasis added). Jafari cites *Intercontinental*, *Marquis*, and *Carney*, but omits the context which proves them disanalagous to this case. What's more, to the extent these cases support the notion that a federal district court has jurisdiction over litigation that hasn't been exhausted, they appear to support it only insofar as the district court *stays* the litigation. But Jafari wants the Court to *hear* his case against the FDIC right now, not stay it. Exhaustion means *exhaustion*, and it would completely subvert the requirement for the Court to hold that merely presenting a claim is adequate under the statute. *See Circle Industries v. City Federal Savings Bank*, 749 F.Supp. 447, 454 (E.D.N.Y. 1990) ("As is clearly indicated in the legislative history of FIRREA, Congress intended that a district court not have subject matter jurisdiction of state law claims . . . until those claims are first presented to *and adjudicated by* . . . the FDIC.") (emphasis added). For the above reasons, the Court finds Jafari has not adequately shown the Court has jurisdiction over his claims.

Jafari's next argument is that his claims against the FDIC qualify for an exception from the exhaustion requirement because they "aris[e] out of a breach of contract entered into by the FDIC after it has taken over a failed bank." (Doc. No. 3-4 at 10.) The case he relies on is *McCarthy v. FDIC*, in which the Ninth Circuit did recognize exceptions for "claims made in connection with bankruptcy proceedings or arising out of a breach of contract fully performed by the aggrieved party but not repudiated by the receiver." 348 F.3d 1075, 1081 (9th Cir. 2003). It is the latter exception that Jafari alleges applies here.

There is more to *McCarthy* than Jafari presents, however. Note the difference, first, between Jafari's formulation of the exception and the Ninth Circuit's. As Jafari would have

it, any breach of contract claim against the FDIC that arises post-receivership needn't be exhausted:

> Here, the FDIC entered into the Release Agreement after it took over La Jolla Bank and breached by failing to reconvey the La Jolla Bank Deed of Trust. That is precisely the type of claim that the Ninth Circuit has ruled is not subject to the claims exhaustion requirement of FIRREA.

(Doc. No. 3-4 at 10.) But the holding in *McCarthy* actually draws on *Sharpe v. FDIC*, 126 F.3d 1147 (9th Cir. 1997), and *McCarthy* noted that *Sharpe* "was an unusual case" and limited its holding to its very particular context. *McCarthy*, 126 F.3d at 1077–78. First, while the claim at issue in *Sharpe*, like the claim at issue here, involved the alleged breach of a contract, there was no dispute that the plaintiff had fully performed. Indeed, the FDIC didn't repudiate its alleged obligation. *Id.* At 1078. The Ninth Circuit reiterated in *McCarthy* that its *Sharpe* decision "turned on the claimants' being aggrieved parties to a contract that the FDIC had not repudiated." *Id.*

Second, the contract at issue in *Sharpe*, unlike the release agreement at issue in this case, was executed (and performed by claimants) *pre*-receivership. The Ninth Circuit in *McCarthy* stressed this. Discussing *Sharpe*, it explained:

> Accordingly, we reasoned, if merely breaching a contract were to make the Sharpes' creditors subject to the claims process, the FDIC "would be free to breach any pre-receivership contract, keep the benefit of the bargain, and then escape the consequences by hiding behind the FIRREA claims process."

*Id.* (citing *Sharpe*, 126 F.3d at 1156, 1157). The *McCarthy* opinion emphasized that, in contrast to the facts of *Sharpe*, "post-appointment claims against the FDIC are subject to FIRREA exhaustion." *Id.* at 1080. "Post-receivership claims arising out of acts by the receiver as well as by the failed institution," it concluded, are "subject to exhaustion." *Id.* at 1081.

Third, the claimants in *Sharpe* were neither creditors nor debtors, but rather, in the eyes of the Ninth Circuit, "aggrieved parties to a contract that the FDIC had not repudiated." *Id.* at 1078. It emphasized that claims by creditors or debtors must, on the other hand, be exhausted. *Id.* at 1079. It reiterated this in the concluding paragraph:

> However, apart from claims . . . arising out of a breach of contract fully performed by the aggrieved party but not repudiated by the receiver, all claims or actions must be submitted for administrative resolution. Accordingly, debtors as well as creditors who assert a qualifying claim or action must exhaust.

*Id.* at 1081. Here, the real party-in-interest to the release agreement is Bacino, a debtor. (ALB is also listed as a signatory, but it did not sign the agreement.) Jafari, who is at best a third-party beneficiary of the release agreement, is certainly not a party to it, and as such can't plausibly claim to be similarly situated to the claimants in *Sharpe*.

For the above reasons, the Court agrees with the FDIC that the exception to FIRREA exhaustion recognized by *McCarthy* is inapplicable here. Jafari has therefore failed to show that the Court has jurisdiction over his claims.

**<u>Availability of Injunctive Relief</u>**

Even if the Court were to find that it has jurisdiction over Jafari's claims, he would run into another problem: FIRREA contains an anti-injunction provision that, in Jafari's own words, "generally bars courts from enjoining the FDIC's exercise of its statutory powers or functions as receiver." (Doc. No. 3-4 at 10.) This provision, 12 U.S.C. § 1821(j), provides that "no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver."

The anti-injunction provision is also "sweeping," to borrow a description from the D.C. Circuit. *See Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) ("Section 1821(j) does indeed effect a sweeping ouster of courts' power to grant equitable remedies.") In fact, the D.C. Circuit recognized in *Freeman* that "the FDIC's broad powers as receiver include the power to foreclose on the property of a debtor held by the failed bank as collateral, and no court may enjoin the exercise of that power." *Id.* This is true "regardless of the claimant's likelihood of success on the merits of his underlying claims." *Id.* The Eleventh Circuit has recently recognized it to be true even if the FDIC "violates its own procedures or behaves unlawfully in doing so." *Bank of America v. Colonial Bank,* 604 F.3d 1239, 1243 (11th Cir.

2010) (citing *Bursik v. One Fourth Street North, Ltd.*, 84 F.3d 1395, 1397 (11th Cir. 1996)). *See also Sharpe*, 126 F.3d at 1154 ("There are few exceptions to this jurisdictional bar. Indeed, the fact that the RTC's actions might violate some other provision of law does not render the anti-injunction provision inapplicable.") (internal quotations and citation omitted); *Sahni v. American Diversified Partners*, 83 F.3d 1054, 1059–60 (9th Cir. 1996) ("Finally, courts have applied § 1821(j) to insulate the actions of the FDIC as receiver from restraint, even where the receiver is alleged to have violated state law and equitable remedies are available.")

There is no dispute here that the challenged foreclosure is the exercise of a receivership function, nor is there a dispute that the relief Jafari seeks—a preliminary injunction—would restrain or affect that function. The anti-injunction provision therefore applies. *See, e.g., Vegas Diamond Properties, LLC v. La Jolla Bank*, 2010 WL 4606461 at *6 (S.D. Cal. Oct. 29, 2010) ("Based upon the record and the above authority, the Court finds that the FDIC's powers as receiver include the power to foreclose on Plaintiff's properties. Accordingly, the Court is prohibited by § 1821(j) from entering a preliminary injunction enjoining the FDIC from foreclosing on Plainitffs' properties.")

Jafari's response to this comes up very short. In essence, he argues that the anti-injunction provision doesn't apply when the FDIC is acting beyond or contrary to its statutory powers. As a general principle, that's true. *See Sharpe*, 126 F.3d at 1155 ("Section 1821(j) shields only the exercise of powers or functions Congress gave to the FDIC; the provision does not bar injunctive relief when the FDIC has acted beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions.") (internal quotations and citation omitted). But again, it was uncontested in *Sharpe* that the FDIC was breaching an agreement. Here, that point is highly contested. Moreover, there is an obvious difference between exercising one's powers wrongfully and acting beyond or contrary to one's powers in the first place. The anti-injunction provision has teeth precisely because, as the cases cited above suggest, it applies even where the FDIC is alleged to be acting unlawfully.

Indeed, the provision would be toothless if a party could circumvent it by showing its claims against the FDIC are righteous.

### Conclusion

The Court finds it has no jurisdiction over Jafari's claims, and concludes anyway that the injunctive relief Jafari requests is barred by FIRREA's anti-injunction provision. His request for a preliminary injunction is therefore **DENIED**. That said, even if the Court were to proceed to the actual preliminary injunction considerations set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), it would still deny the emergency relief. Having considered in their entirety Jafari's moving brief (Doc. No. 3-4) and the FDIC's opposition (Doc. No. 8), the Court would find that Jafari cannot show his claims are likely to succeed on the merits *or* that he is likely to suffer irreparable harm.

**IT IS SO ORDERED**.

DATED: August 20, 2012

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge